## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| EMILY A. TICE, | ) | CASE NO. 5:17-cv-02339 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Emily A. Tice ("Plaintiff" or "Tice") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.

For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.  Procedural History

Tice protectively filed[1] an application for DIB on June 18, 2014, alleging a disability onset date of February 26, 2014.  Tr. 22, 78, 159-165.  She alleged disability due to multiple sclerosis (MS), dysphagia, poor balance/vestibular deficits, unsteady gait, fall risk, painful

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 10/22/2018)

muscle spasms, neurological deficits, chronic fatigue, autoimmune condition, and depression. Tr. 65, 94, 104, 199.   After initial denial by the state agency (Tr. 94-102) and denial upon reconsideration (Tr. 104-110), Tice requested a hearing (Tr. 111-112).  A hearing was held before Administrative Law Judge Gregory M. Beatty ("ALJ") on June 9, 2016.  Tr. 36-64.

In his July 12, 2016, decision (Tr. 19-35), the ALJ determined that Tice had not been under a disability from February 26, 2014, through the date of the decision (Tr. 22, 31).  Tice requested review of the ALJ's decision by the Appeals Council.  Tr. 156-158.  On September 27, 2017, the Appeals Council denied Tice's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Tice was born in 1972.  Tr. 159.   At the time of the hearing, Tice was living with her adult daughter.  Tr. 41.  Tice graduated from high school and completed two years of college. Tr. 43, 200.  Tice's past work included work as a community aide caregiver at a juvenile residential treatment facility, a hospice aide, and a residential aide in an assisted living facility. Tr. 44, 46-47, 60-61.  She last worked at the juvenile residential treatment facility in February 2014.  Tr. 44.  She left that position due to her condition.  Tr. 44-45, 199-200.  When she left her job in 2014, Tice received short-term disability benefits for four months and then started receiving long-term disability benefits.  Tr. 45-46.

### B.    Medical evidence

#### 1.  Treatment history

 Tice was diagnosed with MS in 2008.  Tr. 48, 308.  She also has had problems with her skin over the years.  *See e.g.*, Tr. 266, 505, 625, 641.  Tice's primary care physician prior to and

during the relevant time period was Dianne Kreptowski, D.O.  *See e.g.*, Tr. 308, 331, 354, 396, 483, 582.  Timothy J. Carrabine, M.D., of the Oak Clinic treated Tice for her MS.  *See e.g.*, Tr. 308, 517, 602, 606, 613.  Tice also saw Mitchell Haut, M.D., of Hematology & Oncology Associates, Inc., for her MS.  Tr. 308, 499.  Tice saw Robert Hostoffer, M.D., and other medical providers at Allegery/Immunology Associates, Inc., for her skin problems.  Tr. 266, 625, 640, 646.

Dr. Carrabine's June 2, 2014, treatment notes document Tice's treatment up until that time for her MS.  Tr. 308-309.  As noted therein, Tice first exhibited weakness in her extremities in Spring of 2008.  Tr. 308.  She was evaluated neurologically at that time and she was found to have an abnormal MRI and abnormal spinal fluid analysis, which were consistent with a diagnosis of MS.  Tr. 308.  She was started on interferon and developed a marked skin rash, which was diagnosed as cutaneous lupus.  Tr. 308.  Tice was switched to a non-interferon treatment, which caused intolerable skin site reactions.  Tr. 308.  Tice then switched to an IV chemotherapy/Novantrone, an FDA approved treatment for MS.  Tr. 308.  She continued Novantrone treatment from November 2009 until August 2010.  Tr. 308.  She had back surgeries in October 2010 and April 2011.  Tr. 308.  Following those surgeries, Tice had recurrent MS symptoms and was restarted on Novantrone in June 2011.  Tr. 308.  She tolerated the treatments well and continued those treatments until September 2012.  Tr. 308.  Tice was seen at the Oak Clinic in November 2013 and reported continued problems with her MS, including balance problems and fatigue.  Tr. 308.  Tice returned to hematology/oncology and saw Dr. Haut.  Tr. 308.  Tice was started on IV Cytoxan and was tolerating it well.  Tr. 308.  During her June 2, 2014, visit with Dr. Carrabine, it was noted that Tice had recently seen immunology secondary to

her continued skin difficulties.  Tr. 308.  Dr. Carrabine noted that a November 2013 MRI was consistent with a diagnosis of MS.  Tr. 308.

During her June 2, 2014, visit with Dr. Carrabine, Tice reported fatigue and a friend who was with Tice during the visit inquired about Tice possibly being depressed.  Tr. 309.  Tice denied being depressed.  Tr. 309.  She had stopped taking Adderall for fatigue and had tried another medicine but did not find it to be helpful.  Tr. 309.  Tice noted some short-term cognitive difficulties.  Tr. 309.  Also, she noted difficulty with her gait secondary to balance difficulties and some chronic sensory loss in her lower extremities that affected her gait.  Tr. 309.  She reported some stiffness but denied trips or falls and denied gross motor weakness.  Tr. 309.  Tice relayed that her symptoms were worse if she was overheated or took a warm shower.  Tr. 309.  On physical examination, Dr. Carrabine observed normal muscle tone and strength in the bilateral lower extremities and normal strength in the upper extremities.  Tr. 309.  With respect to Tice's coordination, Dr. Carrabine indicated that finger to nose test was performed without dysmetria bilaterally; heel to shin was performed without gross difficulty; there was no gross ataxia; and rapid alternating movements were normal.  Tr. 309.  With respect to Tice's gait and station, Dr. Carrabine indicated Tice's 100 foot gait was performed, noting that Tice "leans and leads a little bit in the hallway secondary to some balance difficulties[]" but she was "without any foot drop, foot drag, or hip circumduction."  Tr. 309.  Overall, Dr. Carrabine felt that Tice's gait was "fairly symmetric."  Tr. 309.  Dr. Carrabine noted that Tice declined to toe walk or tandem gait due to balance concerns.  Tr. 309.

Dr. Carrabine indicated that Tice's principal neurologic diagnosis was MS.  Tr. 309.  He felt that Tice was doing well neurologically.  Tr. 309.  Tice was comfortable with her chemotherapy treatment and was not interested in other possible treatment options for MS.  Tr.

309-310. Dr. Carrabine felt that physical therapy could help with Tice's fatigue but Tice declined to proceed with physical therapy at that time, citing insurance issues. Tr. 310. Although Tice denied depression, after talking with Dr. Carrabine during the visit, she agreed to try a mild antidepressant. Tr. 310.

Tice saw Dr. Haut on July 1, 2014, with complaints of fatigue and headaches. Tr. 499-502. Tice complained of daily headaches for the prior two weeks but noted that her headaches had started to subside. Tr. 499. Tice reported having fallen twice over the prior month which she attributed to sudden loss of leg strength. Tr. 499. Tice had not started physical therapy but had been swimming in a lake. Tr. 499. After swimming, Tice was fatigued. Tr. 499. Dr. Haut noted that Tice's MS symptoms included forgetfulness, swelling, fatigue, and "MS hug."[2] Tr. 499. Tice reported a dry cough with some emesis. Tr. 499. She was continuing to take Celexa but was not certain that it was helping with her fatigue or depression but felt that she might be less anxious. Tr. 499. Tice's ongoing MS spasms involving her face, feet and legs were unchanged. Tr. 499. She was napping daily for about two hours. Tr. 499. On physical examination. Dr. Haut observed peripheral edema bilaterally in the leg and hand, non-pitting edema, grade +1; normal muscle strength; moderate tenderness over the liver; drug-related alopecia; and diminished deep tendon reflexes throughout. Tr. 501. Dr. Haut assessed relapsing remitting MS; muscle spasms, previously thought to be related to MS but now thought to be related to corticosteroid withdrawal, improved; symptomatic biliary colic; fatigue; autoimmune connective tissue disease/dermal SLE (systemic lupus erythematosus), controlled with Plaquenil

---

[2] "The 'MS Hug' or 'girdling' as it is often referred to is a feeling of tightness occurring in a person's chest, waist and/or torso regions among people afflicted with multiple sclerosis (MS). It has been described by people similar to having a tight rubber band or strap squeezing the region where the sensation is occurring of a girdle like sensation. . . Some describe the 'MS Hug' as a feeling of significant pressure with the torso regions to a feeling of burning or tingling." http://www.msunites.com/multiple-sclerosis-ms-symptoms-torso-tightness-aka-ms-hug/ (last visited 10/22/2018)

+ Dapsone, now without SLE rash; erythematous, popular rash, now suppressed; depression with mood swings; hypertension; SLE, currently controlled with autoimmune dermatitis; multiple thyroid nodules and goiter; delayed chemotherapy-induced nausea and vomiting; amenorrhea; history of pedal edema; chronic fatigue; and mild alopecia, stable.  Tr. 501-502.

Tice saw Dr. Kreptowski on September 3, 2014, for follow up regarding her mixed hyperlipidemia and essential hypertension.  Tr. 528-531.  During the visit, Tice reported muscle pain, fatigue, headache, weakness, muscle cramps, and dizziness.  Tr.  528.  Dr. Kreptowksi's physical examination findings were unremarkable.  Tr. 530.

Tice saw Dr. Hostoffer on November 24, 2014, for her skin rash which had worsened. Tr. 505.  Tice's skin rash was the third outbreak in four months.  Tr.  505.  Tice's rash had been under control in the past.  Tr.  505.  Dr. Hostoffer's diagnosis was other specified pruritic condition and vascular disorders of skin.  Tr. 506.  He prescribed Dapsone and Hydroxyzine.  Tr. 506.  On November 25, 2014, Tice saw Dr. Kreptowski for a follow-up visit regarding her mixed hyperlipidemia and essential hypertension.  Tr. 523.  Tice complained of muscle pain, fatigue, headache, weakness, dry mouth and muscle weakness.  Tr. 523.  She also reported MS flare up. Tr. 523.  On physical examination, Dr. Kreptowski observed no significant rashes or lesions and physical examination findings were generally normal.  Tr. 525.  Dr. Kreptowski refilled prescriptions and recommended that Tice follow up in three months.  Tr. 526-527.  Tice saw Dr. Haut the following day on November 26, 2014.  Tr. 509-513.  Tice reported that she was continuing to have the sensation of "electric pulses" in her feet and an associated intermittent "burning" sensation.  Tr. 509.  The swelling in Tice's feet was stable/modest.  Tr. 509.  Tice continued to have muscle spasm and fatigue.  Tr. 509.  She was sleeping 8-10 hours each night and napping for 2-3 hours on a daily basis.  Tr. 509.  Tice had not had "MS hugs" for four

months but she had developed some numbness in her fingers and forearms.  Tr. 509.  Her

headaches usually occurred following chemotherapy treatment but they had subsided.  Tr. 509.

Tice relayed that her MS symptoms included forgetfulness, swelling, fatigue and spasms.  Tr.

509.  She reported a flare up of cutaneous vasculitis for which her Dapsone was increased.  Tr.

509.  She was continuing to take Celexa but without a clear benefit.  Tr. 509.  Tice continued to

have mild alopecia.  Tr. 509.  She was having occasional episodes of a choking sensation (about

once per week).  Tr. 509.  Tice was scheduled to undergo a hysterectomy in January.  Tr. 509.

Dr. Haut recommended that Tice continue with her chemotherapy treatments but with an

interruption in treatments to allow for Tice's upcoming surgery.  Tr. 512-513.

Tice saw Dr. Carrabine on December 2, 2014.  Tr. 516-519.  On physical examination,

Dr. Carrabine observed normal strength in Tice's upper extremities; 5/5 grip strength bilaterally;

no pronator drift; fairly symmetric good strength in the lower extremities; and strength at least

4+ in the hips, knees, and ankles.  Tr. 517.  Dr. Carrabine's coordination examination revealed a

finger to nose test without dysmetria bilaterally; some nonphysiologic findings; rapid alternating

movements that were normal; mild unsteadiness during Romberg test with eye closure; and heel

to shin without ataxia.  Tr. 517.  With respect to Tice's gait and station, Dr. Carrabine noted that

Tice's 100 foot gait was grossly symmetric; she had no drop foot, foot drag, or hip

circumduction; she had difficulty with balance with five-step toe walk and could not perform a

five-step tandem gait due to balance difficulties.  Tr. 517.  Tice reported some pain in the bottom

of her feet with her gait giving a somewhat slight antalgic appearance.  Tr. 517.  Dr. Carrabine

noted that Tice's lower extremities exhibited good pulses but some mild dependent-type edema

change on the right side more than the left side.  Tr. 518.  Dr. Carrabine advised Tice to hold off

on another chemotherapy treatment until after her upcoming surgery.  Tr. 518.  Dr. Carrabine

discussed various treatment options for Tice's MS.  Tr. 518.  Dr. Carrabine ordered some testing, including testing of Tice's B12 level to make sure that there was no reversible form of neuropathy.  Tr. 518.  Dr. Carrabine encouraged Tice to wear socks designed to help reduce her edema dependent symptoms.  Tr. 518.  Dr. Carrabine switched Tice from Celexa to Cymbalta to help with her mood and fatigue a well as her pain and paresthesias in her lower extremities.  Tr. 518.  Dr. Carrabine recommended follow up in six months.  Tr. 519.

Tice saw Dr. Hostoffer on February 11, 2015.  Tr. 638-640.  Tice was in the midst of a flare up of her vasculitic rash on her legs, arms and flanks.  Tr. 638, 639.  She had been having a flare up since September; she was treating the rash with Palquenil and also taking hydroxyzine but was having trouble sleeping at night.  Tr. 638, 640.  The rash was in the same distribution but was more intense and had worsened since her surgery in January.  Tr. 638.  Dr. Hostoffer discontinued Dapsone, started Tice on prednisone and CellCept[3] and increased her hydroxyzine. Tr. 640.

Tice saw Dr. Kreptowski on February 25, 2015, and throughout 2015, for follow up regarding her mixed hyperlipidemia and essential hypertension.  Tr. 582-585, 587-591.  During a May 27, 2015, visit, Dr. Kreptowski assessed shingles in addition to mixed hyperlipidemia and essential hypertension.  Tr. 591-594.

Tice saw Dr. Carrabine on June 8, 2015.  Tr. 602-605.  Tice reported fatigue and some depression and anxiety.  Tr. 603.  Tice relayed that she was now taking Cymbalta instead of Celexa.  Tr. 603.  She was also taking Ativan at night but relayed that she did not feel it was helpful any longer.  Tr. 603.  Tice noted some short-term cognitive difficulties.  Tr. 603.  Tice relayed that she is careful with her gait due to mild balance difficulties.  Tr. 603.  Tice reported

---

[3] CellCept is an immunosuppressant agent.  Tr. 604.

that her cutaneous vasculitis[4] had acted up and she was placed on a high-dose oral prednisone which helped resolved symptoms in her legs.  Tr. 603.  Tice relayed that she had intermittent numbness in her hands and up into her arms along with some associated weakness.  Tr. 603.  Tice indicated that she felt "like bugs are crawling on me at times."  Tr. 603.  On examination, Tice's 200 foot gait was abnormal – she turned her right foot in.  Tr. 604.  Dr. Carrabine noted that it was difficult to tell whether it was ataxic or antalgic in nature; Tice's speed and stability were good; there was no foot drop or foot drag and no hip circumduction.  Tr. 604.  Dr. Carrabine indicated that Tice's neurological examination showed some mild abnormalities but overall was grossly intact without significant ataxic features.  Tr. 604.  Dr. Carrabine noted that Tice reported some increasing difficulty with numbness in her hands and feet.  Tr. 604.  Since MRI imaging of Tice's brain had not been performed in a while, Dr. Carrabine recommended MRI imagining of the brain and cervical spinal cord.  Tr. 604.  Tice declined physical therapy.  Tr. 604.  She received refills on Cymbalta and Zanaflex and she was switched from Ativan to Xanax.  Tr. 604-605.

A brain MRI and cervical spine MRI were performed on June 17, 2015.  Tr. 596-599.  The brain MRI was compared to a prior study from November 9, 2013, with the results showing findings compatible with MS similar to the prior study and no new or enhancing plaques shown.  Tr. 596.  The cervical spine MRI was compared to a prior study from December 15, 2008, with the results showing no evidence of demyelinating disease within the cervical spine but progression of degenerative change within the cervical spine with a new left-sided disk protrusion at the C6-C7 level.  Tr. 598.

---

[4] Dr. Carrabine's treatment notes reflect that Tice indicated that, at one time she had been diagnosed with cutaneous lupus but that diagnosis was retracted and Tice was diagnosed with cutaneous vasculitis.  Tr. 602-603.

Tice saw Dr. Hostoffer on August 26, 2015, regarding her cutaneous vasculitis and MS. Tr. 640-642.  Tice reported that the prednisone had helped and she had been doing better since her last visit.  Tr. 641.  Tice started on CellCept in February and had only one flare up since that time.  Tr. 641.  The flare up was less intense and lasted about two weeks.  Tr. 641.  Tice was taking two hydroxyzine tablets at night and one during the day.  Tr. 641.  Her symptoms were worse at night and the itching kept her up at night.  Tr. 641.  Tice also complained of spine and hand pain.  Tr. 641.  Dr. Hostoffer observed Tice's vasculitic rash along her lower legs bilaterally and lower arms.  Tr. 642.  Dr. Hostoffer changed the hydroxyzine to Doxepine at night but advised Tice that she could continue to use hydroxyzine during the day for itching.  Tr. 643.  Dr. Hostoffer continued Tice's CellCept at the current dose.  Tr. 643.

Tice saw Dr. Carrabine on October 14, 2015.  Tr. 606-610.  Tice complained, "I feel like my legs and arms are in concrete, tripping upstairs."  Tr. 606.  Tice reported that that the Xanax was helping with her anxiety but she was still fatigued.  Tr. 607.  She complained of short-term cognitive difficulties.  Tr. 607.  Tice relayed that she was careful with her gait secondary to balance but she was not using a gait aid and denied falls or injury.  Tr. 607.  Tice reported some waxing and waning of sensory loss in her lower extremities but denied gross neurologic paresthesia.  Tr. 607.  She had some generalized weakness in her lower extremities that she reported was worse with fatigue towards the end of the day or with stress or overheating and better with rest.  Tr. 607.  On physical examination, Dr. Carrabine noted that Tice had normal strength in her upper extremities and fairly good symmetric strength in her lower extremities; Tice was a little stronger on her right than her left.  Tr. 608.  Tice was able to perform fairly well with finger to nose testing without gross dysmetria and was able to perform heel to shin maneuvers but had some difficulty with the maneuvers secondary to what Tice felt was weakness

of her lower extremities.  Tr. 608.  Dr. Carrabine observed that Tice's 100 foot gait was slightly slow and careful but her gait was symmetric.  Tr. 608.  Dr. Carrabine noted that, during Tice's last examination, she was turning her right foot in but she was not doing that during the examination on October 14.  Tr. 608.  Tice did not have foot drop, foot drag, or hip circumduction.  Tr. 608.  She complained of significant balance difficulties and Dr. Carrabine did not try five-step toe walk or tandem gait.  Tr. 608.  Overall, Dr. Carrabine felt that Tice's examination was very similar to, if not slightly improved from, her Spring 2015 examination.  Tr. 608.  Dr. Carrabine reviewed Tice's June 17, 2015, MRI results with Tice, noting that the cervical spine MRI showed some mild degenerative joint and disc disease at C5-6 and C6-7, no central canal stenosis or severe foraminal stenosis, and no cord lesions of MS.  Tr. 608-609.  Dr. Carrabine indicated that the brain MRI results continued to be consistent with a diagnosis of MS, with no change in lesion number or size compared to prior MRI imagining.  Tr. 609.  Dr. Carrabine noted that Tice seemed a little sad and she had not being doing much.  Tr. 609.  Dr. Carrabine explained that he felt that neurologically Tice seemed stable without further decline in disability which was a good sign but he explained that some of her symptoms were not curable with medications.  Tr. 609.  Dr. Carrabine noted that Tice understood this and suggested that it might be a good time for her to start some light exercise and social activities.  Tr. 609.  Dr. Carrabine also suggested that Tice reduce the amount of Zanaflex that she was taking to see if that would help alleviate some of her fatigue.  Tr. 609.

On November 25, 2015, Tice was seen at Dr. Hostoffer's office for routine follow up.  Tr. 647-649.  Tice complained of an eruption of her skin in September.  Tr. 647.  The skin eruption caused a red, onion appearance on her skin that was dry and occasionally burned and itched.  Tr. 647.  Tice was continuing to take CellCept, Plaquenil, and Doxepin.  Tr. 647.  Per

Tice, the Doxepin was helping a lot with hives and itching at night.  Tr. 647.  Tice was also on a five-day Medrol Dose pack.  Tr. 647.  Dr. Hostoffer observed scarring on Tice's lower extremities from prior cutaneous vasculitis flares.  Tr. 647.  Dr. Hostoffer's diagnoses were autoimmune disease (systemic) NOS, other pruritis, idiopathic urticaria,[5] MS, and vasculitis limited to the skin, unspecified.  Tr. 648.

Tice saw Dr. Carrabine on April 20, 2016.  Tr. 611-615.  Tice explained that her cutaneous vasculitis had been acting up recently.  Tr. 612.  Tice indicated she was careful with her gait secondary to balance difficulties but denied falls or injury.  Tr. 612.  Tice was not using any type of gait aid.  Tr. 612.  She was taking Zanaflex and baclofen for stiffness in her extremities.  Tr. 612.  Tice reported some waxing and waning sensory loss "pulsating" of her lower extremities that was worse with fatigue and better with rest.  Tr. 612.  She had no foot drop or foot drag.  Tr. 612.  Tice was taking Adderall for fatigue.  Tr. 612.  Tice was also taking Vitamin D3.  Tr. 612.  Tice noted some depression and explained that she was scheduled for a new mental health visit that month.  Tr. 613.  Tice's upper extremity strength was normal.  Tr. 613.  Tice exhibited fairly good symmetric strength in her lower extremities.  Tr. 613.  She was a little stronger on the right than on the left.  Tr. 613.  Tice did fairly well with finger to nose testing without gross dysmetria but with some slight variability with the maneuver.  Tr. 613.  In her lower extremities, Tice was slow and careful with heel to shin maneuvers without gross ataxic features.  Tr. 613.  Tice performed 100 foot gait with shoes and in bare feet.  Tr. 613.  Dr. Carrabine noted that Tice performed the 100 foot gait better in bare feet.  Tr. 613.  Dr. Carrabine described Tice's gait as "somewhat slow stiff ataxic, without foot drop foot drag or hip circumduction."  Tr. 613.  Dr. Carrabine indicated that Tice's examination showed some mild

---

[5] "Urticaria is the medical term for hives."  https://www.healthline.com/health/skin-disorders/chronic-idiopathic-urticaria (last visited 10/22/2018)

ataxic features that were similar to past examinations but Tice showed neurologic stability.  Tr. 614.  Dr. Carrabine provided Tice with some literature on a new medication for treatment of MS and possibly for treatment of her cutaneous vasculitis.  Tr. 614.  The medication was not yet approved in the United States but was undergoing FDA review.  Tr. 614.

Tice saw Katherine Lance, PCC, at Phoenix Rising Behavioral Healthcare and Recovery, Inc.  Tr. 743-755.  Tice was interested in both counseling services and medication management. Tr. 743.  Tice was residing with her adult daughter, two grandchildren (ages 4 and 15 months), her sister, and her sister's two children (ages 17 and 9).  Tr. 743.  Tice liked her house but was not sure about having all the people in the house.  Tr. 743.  Tice's relationship with her daughter was a little tense but she had a good relationship with her grandchildren and sister.  Tr. 744.  Tice relayed that she was not looking for work.  Tr. 745.  She had been going through chemotherapy for her MS and was unable to stay at her job; she was too fatigued to perform CPR or restrain anyone.  Tr. 745.  Fifteen years earlier, Tice had sought mental health treatment to help her stop pulling her hair out.  Tr. 746, 748.  She also sought treatment about 12 years earlier to help her work through a family situation.  Tr. 748.  Ms. Lance summarized her impressions, indicating that Tice appeared cooperative, oriented x4, with a depressed and anxious mood and a constricted affect.  Tr. 749.  Tice's thought content appeared to be depressive with racing thoughts but her cognition, insight and judgment appeared within normal limits.  Tr. 749.  Tice reported no hallucinations or delusions.  Tr. 749.  Tice reported past suicidal thoughts but at the visit she denied suicidal ideation, intent, plan or attempt.  Tr. 749.  Ms. Lance diagnosed Tice with bipolar disorder, current episode depressed, moderate, with anxious distress.  Tr. 754.  Ms. Lance recommended medication management and counseling services for Tice's anxiety and depression.  Tr. 754.

### 2.  Opinion evidence

#### a.    Treating source

On September 3, 2014, Dr. Haut completed a medical statement indicating he had treated Tice since November 3, 2009, and last saw her on July 10, 2014, for relapsing, remitting MS.[6] Tr. 496-498.  Dr. Haut indicated that Tice was receiving chemotherapy at that time on a monthly basis for treatment of her MS.  Tr. 497.

#### b.    Consultative examiner

On July 26, 2014, Tice saw James M. Lyall, PhD., ABN, FACPN, for an independent mental disability evaluation.  Tr. 490-493.  Tice relayed that she was unable to work due to complications from MS.  Tr. 490.  Tice was undergoing chemotherapy for treatment of her MS. Tr. 490.  She reported problems with balance, swallowing, fatigue, and muscle spasms.  Tr. 490. Tice also reported some depression.  Tr. 490.  Tice relayed that she slept a lot because of fatigue. Tr. 491.  She did most of the household chores.  Tr. 491.  She stated that she did not socialize often but she liked to spend time with her two sisters.  Tr. 491.  Dr. Lyall assessed depressive disorder, NOS.  Tr. 492.  Dr. Lyall felt that Tice's depression appeared to be associated with her MS and should improve as her MS symptoms improved.  Tr. 492.

#### c.    Reviewing physicians

On September 16, 2014, state agency reviewing physician Venkatachala Sreenivas, M.D., completed a Physical RFC Assessment.  Tr. 71-73.  Dr. Sreenivas opined that Tice had the RFC to occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds, stand and/or walk for a total of 2 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and push and/or pull unlimitedly other than as shown for lift and/or carry.  Tr. Tr.

---

[6] In response to most of the questions on the medical statement, Dr. Haut referred to his treatment records.  Tr. 497-498.

72. Dr. Sreenivas explained the exertional limitations, indicating that Tice's fatigue and MS were considered and Tice could lift 5 pounds frequently. Tr. 72. With respect to postural limitations, Dr. Sreenivas found that Tice could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl and never climb ladders/ropes/scaffolds. Tr. 72. Dr. Sreenivas explained that Tice's postural limitations were due to her MS, fatigue and gait disturbance. Tr. 72. Dr. Sreenivas found that Tice would have to avoid even moderate exposure to extreme heat and concentrated exposure to hazards (machinery, heights, etc.). Tr. 73. Dr. Sreenivas explained that the postural limitations were due to MS and associated fatigue. Tr. 73. Dr. Sreenivas found no manipulative, visual or communicative limitations. Tr. 72-73.

Upon reconsideration, on January 5, 2015, state agency reviewing physician Gary Hinzman, M.D., completed a Physical RFC Assessment. Tr. 85-87. Dr. Hinzman's RFC limitations were the same as those found by Dr. Sreenivas. Tr. 71-73, 85-87.

## C.     Hearing testimony

### 1.     Plaintiff's testimony

Tice was represented at the hearing and testified regarding her impairments. Tr. 38, 41-59. When asked what prevented her from working, Tice indicated that it was her MS. Tr. 47-48. Tice explained that she was having multiple spasms throughout the day and at night. Tr. 48. After being asleep for about an hour or two, Tice wakes up due to spasms. Tr. 48. Her spasms affect her face, hands, legs and feet. Tr. 48. When she has a spasm, her muscles will contort or freeze up. Tr. 49. She has to try to rub out her muscle to relax it. Tr. 49. The spasms in her face are very painful because there is not much she can do for it – she just has to "ride out the spasms." Tr. 49. Tice has spasms on a daily basis. Tr. 49. She tends to have spasms more often when she is relaxed, which is why it is difficult for her to sleep. Tr. 49. Tice estimated having

four bad days a week.  Tr. 57.  She explained that what differentiates a good from a bad day is the frequency of her spasms.  Tr. 57.

Tice also explained that her feet feel like she is constantly stepping on an electrical current.  Tr. 48.  She is almost always in bare feet so that she can feel the ground.  Tr. 48, 49.  If she has to wear a shoe, she has to slap her feet hard so she can feel the ground.  Tr. 48.  Her legs jerk and twitch.  Tr. 48.  She is fatigued and has to take naps on a daily basis.  Tr. 48, 50.  Tice explained that taking a shower wipes her out and she has to rest for about an hour or two after taking a shower in order to get her energy back.  Tr. 48, 55.

Tice indicated that she had cutaneous vasculitis, which she explained is an autoimmune disease of the skin and the subcutaneous skin in the blood vessels.  Tr. 51.  When she has flare ups, she gets lesions all over her skin which can be painful and sometimes bleed.  Tr. 51.  Tice's last flare up was in May 2016.  Tr. 52.  At that time, her doctor increased her CellCept medication and administered a steroid shot.  Tr. 52.  Those interventions helped.  Tr. 52.  Tice indicated that MS and cutaneous vasculitis play off each other, i.e., one tends to set the other off.  Tr. 52.

In April of 2016, Tice started seeing someone at Phoenix Rising for her depression.  Tr. 50.  She felt her depression had gotten to the point that professional help was needed.  Tr. 50.  Tice explained that, since her MS got to the point that she was no longer able to work, she had no desire to interact with anybody and did not feel like living – she was just existing.  Tr. 51.  She recalled what her life used to be like and indicated it was just not the same anymore.  Tr. 51.  Tice has a lot of anxiety and, when she gets a bad anxiety attack, she takes a Xanax.  Tr. 52.  Tice explained that, when she has an anxiety attack, it feels like her heart is going to be ripped

from her chest.  Tr. 52.  Tice indicated she could have three or more anxiety attacks in a week.
Tr. 52-53.

Other than taking medications for her conditions, Tice's doctor taught her deep breathing
techniques and visualization techniques.  Tr. 52.  Tice tends to get sidetracked so she uses alarms
and a white board to help her remember things such as when to take her medication and when
she can and cannot eat because she has to eat with certain medications and cannot eat with other
medications.  Tr. 53-54, 59.  Tice feels that her spasms affect her concentration and focus and
have stopped her from trying to do things.  Tr. 59.

When Tice wakes in the morning, she slowly starts moving her muscles and joints to
stretch and then she gets up and makes coffee.  Tr. 54.  Tice has a computer chair that she uses to
roll around her kitchen because the pulsing in her feet can be intense, causing her feet to jerk and
bounce.  Tr. 54.  When that occurs, Tice usually trips and falls so the chair helps her get around.
Tr. 54.  Tice estimated that she trips and stumbles almost every day.  Tr. 54.  Tice has fallen in
the shower so she no longer showers unless someone else is at home.  Tr. 55.  Tice usually tries
to hold on to a wall, a rail or her computer chair when she is walking.  Tr. 57.  Tice does some
cooking at home – she tries to cook at least once a day.  Tr. 56.  She helps with the dishes and
wiping down the counters because she can do that while seated in her chair.  Tr. 56.  The laundry
room is in the basement so Tice's daughter does the laundry but she brings it upstairs and Tice
folds the laundry at the table.  Tr. 56.  Tice eats out occasionally and sometimes visits her mother
with her sister.  Tr.  56, 57.   Her family has a reunion twice a year which she attends if she is
feeling up to it.  Tr. 57.  Tice indicated that she used to love and be able to garden.  Tr.  56.  Tice
likes to read books but it is hard for her to hold a book for too long without having a spasm so

she has started to listen to books on tape.  Tr. 56-57.   Tice has an iPad that she uses if she needs to use a computer.  Tr. 59.

### 2.   Vocational expert's testimony

Vocational expert Roxanne Benoit testified at the hearing.  Tr.  60-63.  The VE described Tice's past work as community aide caregiver, home health aide, and home health aide (geriatric care).  Tr. 60-61.  The ALJ asked the VE to assume a hypothetical individual of Tice's age, education and background who is limited to a range of sedentary work who is able to do frequent handling, fingering and feeling bilaterally; occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling and crouching; no crawling; no unprotected heights; no moving mechanical parts; no operation of a motor vehicle; occasional exposure to dust, odors, fumes; occasional exposure to extreme heat and extreme cold; and can do simple, routine tasks but not at a production rate pace.  Tr. 61-62.  Based on the hypothetical presented, the VE indicated that the hypothetical individual would be unable to perform Tice's past work.  Tr. 62.  However, there would be other work that the hypothetical individual could perform, including addresser, document preparer, and telephone quotation information clerk.  Tr. 62.  The VE also testified regarding employers' tolerances for an employee being off task and/or being absent.  Tr. 62-63.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[7] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The

---

[7] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his July 12, 2016, decision the ALJ made the following findings:[8]

1.   Tice meets the insured status requirements of the Social Security Act through December 31, 2019.  Tr. 24.

2.   Tice has not engaged in substantial gainful activity since February 26, 2014, the alleged onset date.  Tr. 24

3.   Tice has the following severe impairments: multiple sclerosis, degenerative disc disease, depressive disorder, bipolar disorder, and autoimmune disorder.  Tr. 24.

4.   Tice does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 25-26.

5.   Tice has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) with the following additional limitations.  Tice can frequently handle, finger, and feel bilaterally; can occasionally climb ramps and stairs but cannot climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel and crouch but cannot crawl; cannot work near unprotected heights or moving mechanical parts; cannot operate a motor vehicle as part of a job; can tolerate occasional exposure to dust, odors, fumes and pulmonary irritants; can tolerate occasional exposure to extremes of heat and cold; and can perform simple routine tasks but not at a production rate pace.  Tr. 27-30.

6.   Tice is unable to perform any past relevant work.  Tr. 30.

7.   Tice was born in 1972 and was 41 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 30.

8.   Tice has at least a high school education and is able to communicate in English.  Tr. 30.

9.   Transferability of job skills is not material to the determination of disability.  Tr. 30.

---

[8] The ALJ's findings are summarized.

10. Considering Tice's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Tice could perform, including addresser, document preparer, and telephone quotation clerk. Tr. 30-31.

Based on the foregoing, the ALJ determined that Tice had not been under a disability, as defined in the Social Security Act, from February 26, 2014, through the date of the decision. Tr. 31.

### V. Plaintiff's arguments

Tice argues that the ALJ failed to properly consider her MS and autoimmune disorders at Step Three of the five-step sequential analysis. Doc. 13, pp. 16-21.

### VI. Law & Analysis

**A.      Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The undersigned recommends that the Court find no basis upon which to reverse and remand the Commissioner's decision for further analysis of Tice's impairments under the Listings**

Tice argues that the ALJ erred at Step Three because the records raises a "substantial question" as to whether her severe impairments meet the requirements of Listing 11.09 Multiple Sclerosis, Listing 14.02A Systemic Lupus Erythematosus ("SLE"), Listing 14.03A Systemic Vasculitis and Listing 14.06A Undifferentiated and Mixed Connective Tissue Disease.  Doc. 13, pp. 16-21, Doc. 15.

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a Listing.  *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).   A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. SSA*, 93 Fed. Appx. 725, 728 (6th Cir. 2004).  "If . . . the record 'raises a substantial question as to whether the claimant could qualify as disabled' under a listing, the ALJ should discuss that listing."  *Sheeks v. Comm'r of Soc. Sec. Adm.*, 544 Fed. Appx. 639, 642 (6th Cir. Nov. 20, 2013) (citing *Abbott v.*

22

*Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). However, there is no heightened articulation standard at Step Three. *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. 2006) ("The ALJ did not err by not spelling out every consideration that went into the step three determination[]" where the ALJ considered all impairments and "the ALJ's factual findings [were] supported by substantial evidence.").

Listing 11.09A

Tice first argues that she has met her burden of demonstrating that her relapsing remitting MS meets the requirements of Listing 11.09A. Listing 11.09A requires a showing of multiple sclerosis, characterized by "[d]isorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities[.]" 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.09A.

"Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity." 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.00D1.

"Extreme limitation means the inability to standup from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders)." 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.00D2.

The Listings further explain the meaning of "inability to stand up from a seated position," "inability to maintain balance in a standing position," and "inability to use upper extremities." 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.00D2a-c.

"Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes."  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.00D2s.

"Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes."  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.00D2b.

"Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements . . ."[9]  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.00D2c.

When concluding that Tice did not have an impairment or impairments that met or equaled any listing, the ALJ indicated that he considered all of the listings, with specific emphasis on certain listings, including Listing 11.09.  Tr. 25.  Tice contends that reversal and remand is warranted because the ALJ did not fully analyze the evidence at Step Three as it

---

[9] Section 11.00D2c explains further that "Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a[s] lifting, carrying, pushing, and pulling."  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.00D2c.

related to Listing 11.09.  In arguing that her MS meets Listing 11.09A, Tice relies on her subjective reports regarding her MS symptoms and the limiting effect of those symptoms.  For example, she points to her reports of falling due to MS affecting her motor function in her legs and her need to use an assistive device to get around the house because of problems with her balance, i.e., use of a rolling chair to get around the kitchen.  Doc. 13, pp. 18-19.  Tice also points to examination notes from her visits with Dr. Carrabine to argue that her MS meets Listing 11.09A.  Doc. 13, pp. 18-19.

The ALJ considered Tice's subjective allegations but found that Tice's allegations regarding the limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record.  Tr. 27-29.   In concluding that Tice's allegations were not entirely consistent with the record, among other evidence, the ALJ considered medical records from Tice's visits with Dr. Carrabine.  Tr. 27.  For example, in addressing this evidence, the ALJ stated

> [Tice] testified she has a difficult time sitting, standing, or walking for long periods of time due to the onset of muscle spasms, and irritation in her feet (hearing testimony).  However, multiple physical status examinations in this record have shown the claimant to have at worst, a slightly slow gait, with no instability, no muscle strength loss, and no motor control loss (e.g., 2F4, 8F4).  The claimant's testimony concerning muscle spasms and the problems with her feet also are inconsistent with her prior statements to Dr. Lyall, wherein she admitted she performs most of the household chores in her home (4F3).

Tr. 27-28.

While not specifically contained within the ALJ's Step Three analysis, the foregoing shows that the ALJ considered the evidence that Tice relies upon in an attempt to demonstrate that the ALJ should have further analyzed her impairments under Listing 11.09A.   It is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Furthermore, although Tice contends that there is

evidence to support her position, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Moreover, the ALJ's decision, as a whole, contains sufficient information and analysis to allow this Court to conduct a meaningful judicial review and to conclude that the ALJ's Step Three finding as to Listing 11.09A is supported by substantial evidence.

The ALJ considered that no treating or examining physician indicated findings that would satisfy the severity requirements of any listing and the ALJ also considered the opinions of the state agency reviewing physicians who did not find listing level severity.[10]  Tr. 25.  Further, while Tice reported using a rolling chair around her kitchen, Tice has not shown that using a rolling chair in her kitchen satisfies the requirement under Listing 11.09A that her impairments cause an "extreme limitation" in her the ability to stand up from a seated position, balance while standing or walking, or use her upper extremities.  This is especially so in light of the ALJ's finding and evidence showing that Tice did not require the use of ambulatory assistive devices. Tr. 28; *see also* Tr. 607 (Dr. Carrabine 10/14/2015 office visit notes reflecting that Tice was careful with her gait secondary to balance but she was not using a gait aid and denied falls or injury); Tr. 612 (Dr. Carrabine 4/20/2016 office visit notes reflecting that Tice was not using a gait aid and denied falls or injury).

---

[10] Tice takes issues with the ALJ's reliance on the state agency reviewing physicians' opinions because they did not have the benefit of reviewing the entire record and her impairments fall outside the specialties (surgery and radiology) of the reviewing physicians.  Doc. 13, p. 19, n. 5.  Even though the state agency reviewing physicians rendered their opinions earlier, the ALJ considered the entirety of the record.  Also, while the state agency reviewing physicians' specialties may not align completely with Tice's impairments, the ALJ's disability determination is not based solely on the opinions of the state agency reviewing physicians and, as noted by the ALJ, none of Tice's treating or examining physicians indicated findings that would satisfy the severity requirements of any listing.

Additionally, Tice has not argued or shown that the ALJ's credibility assessment is flawed.  As noted above, the ALJ considered Tice's subjective allegations, including her hearing testimony, but found her statements not entirely credible.   Furthermore, the ALJ considered Dr. Carrabine's examination findings. Tr. 27, 309 (Exhibit 2F4), 517 (Exhibit 8F4).

Considering the foregoing, the undersigned recommends that the Court reject Tice's request to reverse and remand the Commissioner's decision for further consideration of her impairments under Listing 11.09A.

<u>Listings 14.02A, 14.03A, and 14.06A</u>

In her opening brief, Tice contends that she meets Listing 14.02A Systemic Lupus Erythematosus (SLE).  Doc. 13, pp. 20-21.  As noted by the Commissioner, medical records from Dr. Carrabine reflect that, while Tice had been diagnosed with cutaneous lupus at one time, that diagnosis was retracted and she was diagnosed with cutaneous vasculitis.  Doc. 14, p. 15, Tr. 603.  In response, Tice argues in her reply brief that Dr. Carrabine treated her for MS whereas Dr. Hostoffer treated her for autoimmune conditions and, Dr. Hostoffer's notes from November 2015 reflect diagnoses of autoimmune disease (systemic), not otherwise specified; other pruritis; idiopathic urticaria; MS; and vasculitis limited to the skin, unspecified.  Doc. 15, p. 1, Tr. 648. She proceeds to argue in her reply brief that, if the Court finds that Tice did not have SLE, then other listings would be applicable; namely, Listing 14.03A Systemic Vasculitis or Listing 14.06A Undifferentiated and Mixed Connective Tissue Disease.  Doc. 15.

In her opening brief Tice cites to a treatment note from July 10, 2014, wherein Dr. Haut, her oncologist describes one or more of her conditions as autoimmune connective tissue disease/dermal SLE and systemic lupus erythematosus (SLE).  Doc. 13, p. 20 (Tr. 501-502). That treatment note, however, indicates that Tice's autoimmune dermatitis is controlled with

medication.  Tr. 502.  Further, during a visit with Dr. Carrabine that post-dates Dr. Haut's July 10, 2014, treatment note, Tice explained to Dr. Carrabine that her diagnosis of cutaneous lupus had been retracted and she had been diagnosed with cutaneous vasculitis.  Tr. 603 (Dr. Carrabine 6/8/2015 treatment notes).   Considering the foregoing records, the undersigned recommends that the Court reject Tice's request for a reversal and remand for further evaluation of whether her impairments meet Listing 14.02A Systemic Lupus Erythematosus (SLE) since, to the extent that she had been diagnosed with SLE, that diagnosis was retracted.

Since Tice did not raise arguments based on Listing 14.03A Systemic Vasculitis and Listing 14.06A Undifferentiated and Mixed Connective Tissue Disease until her reply brief, the undersigned recommends that the Court decline to consider those arguments and deem them waived.  *See Hunt v. Big Lots Stores, Inc.*, 244 F.R.D. 394, 397 (N.D. Ohio 2007) (finding arguments first in reply brief waived).

Even if Tice's arguments are not deemed waived, the Court should reject Tice's request to reverse and remand the case for further consideration of her impairments under these newly identified listings because the ALJ found that one of Tice's severe impairments was autoimmune disorder and indicated that he considered all of the listings at Step Three.  Tr. 24, 25.  In reaching his conclusion that Tice's impairments did not meet a listing, the ALJ considered the opinions of the state agency reviewing physicians who did not find listing level impairments.  Tr. 25.  Additionally, while the records Tice relies upon to argue that she meets Listing 14.03A or 14.06A document various skin conditions and flare ups of rashes, the ALJ found that no treating or examining physician indicated findings that would satisfy the severity requirements of any listed impairment.  Tr. 25.  Further, while Tice continued to have some flare ups, various treatment records reflect that her autoimmune conditions were under control with medication.

28

Tr. 502, 512, 641.  For example, in August 2015, Tice reported doing better since her prior visit in February, noting she only had one flare up since then and it was less intense.  Tr. 641.  Also, at the hearing, Tice indicated that her doctor was able to get a recent flare up of her cutaneous vasculitis under control by increasing her CellCept and administering a steroid shot.  Tr. 52.

Also, Tice has not met her burden of showing that that her impairments meet Listing 14.03A or 14.06A.

In order to meet Listing 14.03A – systemic vasculitis – Tice must demonstrate that she has systemic vasculitis <u>as described in 14.00D2</u>, with:

A.  Involvement of two or more organs/body systems, with:

1.  One of the organs/body systems involved to at least a moderate level of severity; and

2.  At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 14.03.

Section 14.00D2 states:

2. Systemic vasculitis (14.03).

a.  General.

(i)  Vasculitis is an inflammation of blood vessels. It may occur acutely in association with adverse drug reactions, certain chronic infections, and occasionally, malignancies. More often, it is chronic and the cause is unknown. Symptoms vary depending on which blood vessels are involved. Systemic vasculitis may also be associated with other autoimmune disorders; for example, SLE or dermatomyositis.

(ii)  There are several clinical patterns, including but not limited to polyarteritis nodosa, Takayasu's arteritis (aortic arch arteritis), giant cell arteritis (temporal arteritis), and Wegener's granulomatosis.

b. Documentation of systemic vasculitis. Angiography or tissue biopsy confirms a diagnosis of systemic vasculitis when the disease is suspected clinically. When you have had angiography or tissue biopsy for systemic vasculitis, we will make every

reasonable effort to obtain reports of the results of that procedure. However, we will not purchase angiography or tissue biopsy.

20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 14.00D2.

In order to meet Listing 14.06A – undifferentiated and mixed connective tissue disease – Tice must demonstrate that she has undifferentiated and mixed connective tissue disease as described in 14.00D5, with:

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 14.06A.

Section 14.00D5 states:

5. Undifferentiated and mixed connective tissue disease (14.06).

a. General. This listing includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders described. For example, you may have clinical features of SLE and systemic vasculitis, and the serologic (blood test) findings of rheumatoid arthritis.

b. Documentation of undifferentiated and mixed connective tissue disease. Undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease. Mixed connective tissue disease (MCTD) is diagnosed when clinical features and serologic findings of two or more autoimmune diseases overlap.

20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 14.00D5.

Tice argues that the evidence shows involvement of at least two body systems and at least two of the constitutional symptoms or signs as required by the "A" section.   Even if the evidence Tice relies upon were sufficient to show involvement of at least two body systems and

at least two of the constitutional symptoms or signs as required by the "A" section, Tice fails to demonstrate how her impairments meet the definition of systemic vasculitis and/or undifferentiated and mixed connective tissue disease.  She acknowledges the definitional sections for systemic vasculitis (14.00D2) and undifferentiated and mixed connective tissue disease (14.00D5) in footnotes (Doc. 15, pp. 1-2, n. 1-2) but she does not explain what evidence demonstrates that her impairments meet those definitions.

Based on the foregoing, the undersigned finds that Tice waived her arguments and/or has not demonstrated that a substantial question existed as to whether Tice could qualify as disabled under Listing 14.02A, 14.03A or 14.06A such that more detailed analysis by the ALJ with respect to these Listings was necessary.  Accordingly, the undersigned recommends that the Court reject Tice's request for reversal and remand for further consideration of whether her autoimmune disorder meets a listing.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


October 23, 2018                                    */s/ Kathleen B. Burke*
                                                   Kathleen B. Burke
                                                   United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).